"Interest Reduction Cash Payment Amount" of a Purchaser means such Purchaser's pro rata share of the Interest Reduction Cash Payment, calculated as provided in Section 2.06(a) hereof.

"Italian Lire" or "LRA" means lawful currency of the Republic of Italy.

"Japanese Yen" or "YEN" means lawful currency of Japan.

"Judgment Currency" has the meaning specified in Section 6.08(b) hereof.

"London Process Agent" has the meaning specified in Section 6.07(b) hereof.

"Majority Purchasers" means, at any time of determination, Purchasers having more than 50% of the U.S. Dollar equivalent (as determined in accordance with Section 6.14 hereof) of the aggregate amount, at such time, of the Reconciled EI and Unreconciled EI of all Purchasers.

"Minimum Amounts" means the aggregate face amount of U.S.$1,000,000 or such lesser face amount if it represents a Purchaser's total entitlement to Floating Rate Bonds.

"Minimum Multiple" means U.S.$1,000.

"New York Process Agent" has the meaning specified in Section 6.07(b) hereof.

"1985 TCA" means the Term Credit Agreement dated as of August 1, 1985, among BCRA, the Republic of Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended and restated as of August 1, 1987 and as further amended as of March 1, 1988.

"1987 BNA Refinancing Agreement" means the Refinancing Agreement dated as of August 1, 1987 among Banco de la Nación Argentina, as borrower, Manufacturers Hanover Trust Company, as agent, and the banks party thereto.

"1987 GRA" means the Guaranteed Refinancing Agreement dated as of August 1, 1987 among the borrowers listed therein, BCRA, the Republic of Argentina, as

16

guarantor, the syndicate agents named therein and the banks party thereto.

"1987 Provincia Refinancing Agreement" means the Refinancing Agreement, dated as of August 1, 1987, among Banco de la Provincia de Buenos Aires, as borrower, The Bank of New York, as agent, and the banks party thereto.

"1987 TCA" means the Term Credit Agreement dated as of August 1, 1987, among BCRA, the Republic of Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended.

"1983 TCA" means the Term Credit Agreement dated as of August 16, 1983, among BCRA, the Republic of Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended and restated as of August 1, 1987 and as further amended as of March 1, 1988.

"1992 Financing Plan" means the Republic of Argentina 1992 Financing Plan dated June 23, 1992 sent to the International Banking Community with the communication dated June 23, 1992, and a supplemental communication dated November 10, 1992, both from the Minister of Economy and Public Works and Services of Argentina.

"Non-U.S. Global Exchange Date" means the 40th calendar day following the Exchange Date.

"Non-U.S. Global Floating Rate Bonds" means the Temporary Global Bearer Floating Rate Bonds, the Permanent Global Bearer Floating Rate Bonds and the Non-U.S. Permanent Global Registered Floating Rate Bonds.

"Non-U.S. Offering" means the offering of the Bonds outside the United States pursuant to Regulation S.

"Non-U.S. Permanent Global Registered Floating Rate Bonds" means the Non-U.S. Permanent Global Registered Floating Rate Bonds issued by Argentina, substantially in the form of Exhibit 2C hereto.

"Non-U.S. Person" means any Person other than a U.S. Person.

"Non-U.S. Purchaser" means any Purchaser other than a U.S. Purchaser.

17

"Objection Notice" has the meaning specified in Section 2.10(b) hereof.

"Obligor" has the meaning specified in the introductory paragraph hereof.

"Obligor Consent" means the Obligor Consent in the form of Exhibit 5 hereto.

"Offering" means a U.S. Offering or a Non-U.S. Offering.

"Offshore Custodian" means Citibank, N.A., London Branch.

"Offshore Offices" has the meaning specified in Section 6.17(a) hereof.

"Option" means any option or right to acquire Bonds, it being understood that Eligible Interest shall not be considered an Option.

"Original Currency" has the meaning specified in Schedule B hereto.

"Other Applicable Taxes" has the meaning specified in Section 6.06(b) hereof.

"Paying Agency Taxes" has the meaning specified in Section 6.06(a) hereof.

"Paying Agent" has the meaning specified in the Fiscal Agency Agreement.

"Permanent Global Bearer Floating Rate Bond" means each Permanent Global Bearer Floating Rate Bond issued by Argentina, substantially in the form of Exhibit 2B hereto.

"Person" means an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other juridical entity, or a sovereign state or any agency or political subdivision thereof.

"Pesos" means lawful currency of Argentina.

"Portuguese Escudos" or "ESC" means lawful currency of the Republic of Portugal.

18

"Pounds Sterling" or "STG" means lawful currency of the United Kingdom.

"Principal Bond Exchange Agreement" means the Collateralized Discount Bond and Par Bond Exchange Agreement dated the date hereof among Argentina (on its own behalf and on behalf of each other Obligor), the Closing Agent, the Debt Agreement Agents parties thereto, the Promissory Note Agent and the Purchasers parties thereto, as amended and in effect from time to time.

"Principal Bonds" has the meaning specified in the Principal Bond Exchange Agreement.

"Process Agents" has the meaning specified in Section 6.07(b) hereof.

"Promissory Note Agent" has the meaning specified in the introductory paragraph hereof.

"Promissory Notes" means (i) the instruments issued by Argentina and BCRA pursuant to BCRA Communications A-251, A-695, A-696, A-697, A-790, A-893, A-894, A-895, A-946 and A-956, as amended or supplemented, (ii) the instruments issued pursuant to BCRA Communications A-1084, A-1122, A-1274, A-1745 and A-1963 and (iii) all bonds, promissory notes or other contractual obligations maturing prior to the Exchange Date (whether in accordance with their original schedules or otherwise), in each case, which are eligible to be exchanged for the instruments issuable pursuant to BCRA Communications A-1084 and A-1122.

"Public Sector Onlending Agreements" means any agreement documenting an Additional Loan (as defined in the 1983 TCA and the 1985 TCA) or an Investment Fund Loan (as defined in the 1987 TCA) to any Argentine public sector borrower.

"Purchasers" has the meaning specified in the introductory paragraph hereof.

"Purchasers' Cash Escrow Amount" for any date means the product of (x) the sum of the Cash Payment and the Interest Reduction Cash Payment multiplied by (y) a fraction the numerator of which shall be equal to the sum of the Unreconciled EI of all Purchasers for such date and the denominator of which shall be equal to the aggregate amount of Eligible Contractual Interest (calculated as provided in Section 2.06(c)).

19

"<u>Purchasing Office</u>" means, with respect to each Purchaser, the office or Affiliate of such Purchaser specified opposite its name on Schedule A hereto or any other office or Affiliate of such Purchaser hereafter selected and notified to Argentina and the Closing Agent from time to time by such Purchaser in accordance with Section 6.10(a) hereof.

"<u>QIB</u>" means a "Qualified Institutional Buyer" within the meaning of Rule 144A promulgated under the Securities Act.

"<u>Qualifying Non-U.S. Person</u>" means a Non-U.S. Person who represents and agrees that it will only offer or sell Bonds (a) to a Qualifying Non-U.S. Person outside the United States, (b) to a Qualifying U.S. Fiduciary or (c) with respect to U.S. When-Issued Bonds only, in the United States without using any General Solicitation Methods (i) to a Qualifying QIB in Minimum Amounts or (ii) after the signing of this Agreement, to the Purchasers listed on the signature pages hereof.

"<u>Qualifying QIB</u>" means a U.S. Person who is a QIB who represents and agrees (a) that the Bonds or Options have not been registered under the Securities Act, (b) that it will not reoffer or resell the Bonds or Options except (i) before issuance of the Bonds, (A) to another Qualifying QIB in Minimum Amounts without using any General Solicitation Methods, (B) after the signing of this Agreement, to the Purchasers listed on the signature pages hereof without using any General Solicitation Methods or (C) to a Qualifying Non-U.S. Person outside the United States or to a Qualifying U.S. Fiduciary and (ii) after the issuance of the Bonds, pursuant to the transfer restrictions referred to in Section 7 of the Fiscal Agency Agreement, (c) that it was not induced to buy such Bonds by means of any General Solicitation Methods and (d) that it will obtain from any QIB to whom it resells representations and agreements substantially as set forth in clauses (a), (b), (c) and (d) of this definition.

"<u>Qualifying U.S. Fiduciary</u>" means a U.S. broker/dealer or other fiduciary acting on behalf of a Non-U.S. Person in accordance with Rule 902(o)(2) of Regulation S under the Securities Act where such broker/dealer or other fiduciary represents and agrees that neither it nor any such Non-U.S. Person will reoffer or resell except to a Qualifying Non-U.S. Person outside the United States.

20

"Receipt" has the meaning specified in the Custodian Agreement.

"Recognized Holder" means, with respect to Eligible Interest, (i) the holder of record of the Eligible Debt related to such Eligible Interest or (ii) any Person designated in writing by such holder of record or other Recognized Holder to be entitled to receive all or any portion of the Eligible Interest in respect of a particular item of Eligible Debt.

"Reconciled ECI" of a Purchaser means (i) on any day, each item of Eligible Contractual Interest or any portion thereof as to which, on or prior to such day, the relevant Debt Agreement Agent (or, in the case of Eligible Contractual Interest arising under the Promissory Notes, the Promissory Note Agent), has confirmed to the Closing Agent and to Argentina that, by virtue of the reconciliation process, such Purchaser is the Recognized Holder; provided, however, that the Closing Agent shall not have received an Objection Notice with respect to such item of Eligible Contractual Interest from Argentina pursuant to Section 2.10 hereof, and (ii) for the Exchange Date or an Escrow Release Date, the USD Equivalent of such Purchaser's Reconciled ECI on the Exchange Date or such Escrow Release Date, as the case may be; provided, further, however, that Reconciled ECI of a Purchaser as of any day following the Exchange Date or an Escrow Release Date, as the case may be, shall not include the Reconciled ECI of such Purchaser which has been discharged on the Exchange Date or such Escrow Release Date, as the case may be, pursuant to Section 2.02 hereof. The amount of each Purchaser's Reconciled ECI shall be as set forth on Schedule A hereto (after giving effect to adjustments to Schedule A pursuant to Section 6.01 hereof).

"Reconciled EI" of a Purchaser means (i) on any day, each item of Eligible Interest or any portion thereof as to which, on or prior to such day, the relevant Debt Agreement Agent (or, in the case of Eligible Interest arising under the Promissory Notes, the Promissory Note Agent) has confirmed to the Closing Agent and to Argentina that, by virtue of the reconciliation process, such Purchaser is the Recognized Holder; provided, however, that the Closing Agent shall not have received an Objection Notice with respect to such item of Eligible Interest from Argentina pursuant to Section 2.10 hereof, and (ii) for the Exchange Date or an Escrow Release Date, the USD Equivalent of such Purchaser's Reconciled EI on

21

the Exchange Date or such Escrow Release Date, as the case may be; *provided, further, however*, that Reconciled EI of a Purchaser as of any day following the Exchange Date or an Escrow Release Date, as the case may be, shall not include the Reconciled EI of such Purchaser which has been discharged on the Exchange Date or such Escrow Release Date, as the case may be, pursuant to Section 2.02 hereof. The amount of each Purchaser's Reconciled EI shall be as set forth on Schedule A hereto (after giving effect to any adjustments to Schedule A pursuant to Section 6.01 hereof).

"Reconciliation Cut-Off Date" for the Exchange Date or an Escrow Release Date, as the case may be, means the 20th calendar day preceding the anticipated date for the Exchange Date or such Escrow Release Date, as the case may be, as notified by the Closing Agent pursuant to Section 2.05(a) hereof.

"Reconciliation Notice" has the meaning specified in Section 2.10(b) hereof.

"Registered Floating Rate Bonds" means the Floating Rate Bonds issued by Argentina in registered form without coupons, in substantially the form of Exhibit 1B hereto.

"Registrar" has the meaning specified in the Fiscal Agency Agreement.

"Regulation S" means Regulation S promulgated on April 24, 1990 under the Securities Act, as in effect from time to time.

"Requisite Purchasers" has the meaning specified in Section 5.02(a) hereof.

"Salto Grande GRA" means the Guaranteed Refinancing Agreement dated as of December 1, 1987 among Comision Tecnica Mixta de Salto Grande, as borrower, Argentina, BCRA, the banks parties thereto and The Bank of New York, as syndicate agent for such banks.

"Securities Act" means the Securities Act of 1933 of the United States, as amended and in effect from time to time.

"Securities Act Legend" means the following legend printed in all capital letters:

22

THIS BOND HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY IN THE UNITED STATES OF AMERICA, ITS TERRITORIES OR POSSESSIONS, OR TO OR FOR THE ACCOUNT OF ANY U.S. PERSON (AS DEFINED IN REGULATION S OF THE UNITED STATES SECURITIES ACT OF 1933), EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR IN A TRANSACTION NOT REQUIRING REGISTRATION UNDER SUCH ACT. THIS BOND IS TRANSFERABLE ONLY AS PROVIDED HEREIN AND IN THE FISCAL AGENCY AGREEMENT REFERRED TO BELOW.

"<u>Series</u>" means each of the Series of Floating Rate Bonds, including each of the Series L Floating Rate Bonds and the Series U Floating Rate Bonds in both registered and bearer form.

"<u>Spanish Pesetas</u>" or "<u>PTA</u>" means lawful currency of the Kingdom of Spain.

"<u>Swiss Francs</u>" or "<u>SSF</u>" means lawful currency of the Swiss Confederation.

"<u>Temporary Global Bearer Floating Rate Bonds</u>" means the Temporary Global Bearer Floating Rate Bonds issued by Argentina, substantially in the form of Exhibit 2A hereto.

"<u>Termination Date</u>" has the meaning specified in Section 6.09(a) hereof.

"<u>Terms and Conditions</u>" means the provisions set forth under the "Terms and Conditions of Bonds" endorsed on the reverse of the Floating Rate Bonds.

"<u>Transferee</u>" has the meaning specified in Section 6.10(c) hereof.

"<u>Translation Rate</u>" has the meaning specified in Schedule B hereto.

"<u>Translation Rate Determination Date</u>" has the meaning specified in Schedule B hereto.

"<u>United States</u>" and "<u>U.S.</u>" each means the United States of America; <u>provided</u> that, as used in Article III, in Section 4.02(j) and in the definition of "U.S. Person" below, "<u>United States</u>" means the United States of America, its territories and possessions, any State of the United States and the District of Columbia.

23

"Unreconciled ECI" of a Purchaser means (i) for the Exchange Date, the USD Equivalent of the Unreconciled ECI claimed by such Purchaser as indicated in the statement sent by the Closing Agent pursuant to Section 2.05(b) for the Exchange Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b)) and (ii) for an Escrow Release Date, the USD Equivalent of the Unreconciled ECI claimed by such Purchaser as indicated in the statement sent by the Closing Agent pursuant to Section 2.05(b) for such Escrow Release Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b)) other than such Unreconciled ECI which, in the case of the Final Escrow Release Date, pursuant to Section 3.04(b) hereof is not considered to be Unreconciled ECI of such Purchaser; provided, however, that, in calculating the Unreconciled ECI of any Purchaser, the provisions of Section 2.06(c) shall apply and provided further, that Unreconciled ECI shall not include any Eligible Contractual Interest which has been included in the Reconciled ECI of any Purchaser. The amount of each Purchaser's Unreconciled ECI shall be as set forth on Schedule A hereto (after giving effect to adjustments to Schedule A pursuant to Section 6.01 hereof).

"Unreconciled EI" of a Purchaser means (i) for the Exchange Date, the USD Equivalent of the Unreconciled EI claimed by such Purchaser as indicated in the statement sent by the Closing Agent pursuant to Section 2.05(b) for the Exchange Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b)) and (ii) for an Escrow Release Date, the USD Equivalent of the Unreconciled EI claimed by such Purchaser as indicated in the statement sent by the Closing Agent pursuant to Section 2.05(b) for such Escrow Release Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b)) other than such Unreconciled EI which, in the case of the Final Escrow Release Date, pursuant to Section 3.04(b) hereof is not considered to be Unreconciled EI of such Purchaser; provided, however, that, in calculating the Unreconciled ECI of any Purchaser, the provisions of Section 2.06(c) shall apply and provided further, that Unreconciled EI shall not include any Eligible Interest which has been included in the Reconciled EI of any Purchaser. The amount of each Purchaser's Unreconciled EI shall be as set forth on Schedule A hereto (after giving effect to adjustments to Schedule A pursuant to Section 6.01 hereof).

"**USD Equivalent**" means (i) of any amount of Eligible Interest denominated in an Original Currency other than U.S. Dollars, a U.S. Dollar amount calculated on the basis of the Translation Rate applicable to such Original Currency and (ii) of any amount of Eligible Interest denominated in U.S. Dollars, such U.S. Dollar amount.

"**U.S. Dollars**" or "**U.S.$**" or "**USD**" means lawful currency of the United States.

"**U.S. Offering**" means the offering of the Bonds in the United States pursuant to Section 4(2) of the Securities Act.

"**U.S. Person**" means (i) any natural person resident in the United States; (ii) any partnership or corporation organized or incorporated under the laws of the United States; (iii) any estate of which any executor or administrator is a U.S. Person; (iv) any trust of which any trustee is a U.S. Person; (v) any agency or branch of a foreign entity located in the United States; (vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (viii) any partnership or corporation if (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. Person principally for the purpose of investing in securities not registered under the Securities Act <u>unless</u> it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts; <u>provided</u>, <u>however</u>, that the following shall not be deemed to be U.S. Persons:

   (1) any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a Non-U.S. Person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States;

   (2) any estate of which any professional fiduciary acting as an executor or administrator is a U.S. Person if (i) another executor or administrator who is not a U.S. Person has sole or shared investment discretion with respect to the

25

assets of the estate and (ii) the estate is governed by foreign law;

(3) any trust of which any professional fiduciary acting as a trustee is a U.S. Person if (i) another trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets and (ii) no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person;

(4) any branch or agency of a U.S. bank or insurance company located outside the United States if such agency or branch (i) operates for valid business reasons, (ii) is engaged in the banking or insurance business and (iii) is subject to substantive local banking or insurance regulation; and

(5) multinational entities such as the United Nations, the International Monetary Fund, the International Bank for Reconstruction and Development, the various development banks and their agencies, affiliates and pension plans.

"U.S. Purchaser" means any Purchaser that is (i) a "United States person" (as defined in Section 7701(a)(30) of the Code) or (ii) a U.S. Person; provided, however, that a U.S. Purchaser shall not include a foreign branch of a United States "financial institution" (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v)) that agrees to comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Code.

"U.S. Temporary Escrow Global Registered Floating Rate Bond" means the U.S. Temporary Escrow Global Registered Floating Rate Bond issued by Argentina, substantially in the form of Exhibit 2D hereto.

"U.S. Temporary Global Registered Floating Rate Bond" means the U.S. Temporary Global Registered Floating Rate Bond issued by Argentina, substantially in the form of Exhibit 2C hereto.

"U.S. When-Issued Bonds or Options" means any Bond or Option to be acquired by a Non-U.S. Person pursuant to either subclause (A)(2) of Section 4.02(i)(vi) hereof or subclause (C) of Section 4.02(i)(vii) hereof.

26

"**Waiver**" means, with respect to a Purchaser party to any Existing Agreement, the favorable response given by such Purchaser to the Waiver and Amendment Request.

"**Waiver and Amendment Request**" means the request for waivers and amendments dated June 23, 1992 set forth by Argentina in Part III of the 1992 Financing Plan.

"**Working Committee for Argentina**" means the following group of thirteen banks which has acted as a communications link between Argentina and the International Banking Community: Bank of America National Trust and Savings Association, The Bank of Tokyo, Ltd., The Chase Manhattan Bank (National Association), Chemical Bank, Citibank, N.A., Crédit Lyonnais, Crédit Suisse, Dresdner Bank AG, Lloyds Bank Plc, Midland Bank plc, Morgan Guaranty Trust Company of New York, Royal Bank of Canada and The Sanwa Bank, Ltd.

SECTION 1.02. **References to Articles, Etc.** Any reference to Articles, Sections, Exhibits, Annexes or Schedules, unless expressly otherwise provided herein, shall be references to Articles, Sections, Exhibits, Annexes or Schedules to or of this Agreement.

27

## ARTICLE II

### THE CASH PAYMENT, THE INTEREST REDUCTION CASH PAYMENT AND THE EXCHANGE

SECTION 2.01. *Payment and Exchange of Eligible Interest*. (a) *Escrow Date*. If the Exchange Date is the Escrow Date, subject to the conditions precedent set forth in Section 2.03 and in accordance with the other terms and conditions of this Agreement, Argentina shall on the Escrow Date:

  (i) issue in the name of and deliver to the Escrow Agent, for the benefit of the Purchasers pursuant to this Agreement, a single U.S. Temporary Escrow Global Registered Floating Rate Bond representing the Bonds of both Series in an aggregate principal amount equal to the Escrowed Bond Amount; and

  (ii) pay to the Escrow Agent the Cash Escrow Amount for the Escrow Date for the benefit of the Purchasers pursuant to this Agreement, in accordance with Section 3.04 hereof.

  (b) *Exchange Date*. If the Exchange Date is not the Escrow Date, subject to the conditions precedent set forth in Section 2.03 and in accordance with the other terms and conditions of this Agreement, Argentina shall on the Exchange Date:

  (i) pay to each Purchaser the Cash Payment Amount of such Purchaser for the Exchange Date as a payment in respect of Reconciled ECI;

  (ii) pay to each Purchaser the Interest Reduction Cash Payment Amount of such Purchaser as a payment in respect of Reconciled ECI;

  (iii) issue and deliver to the Common Depositary and the Registrar for the account of the Purchasing Offices of each Purchaser, in exchange for such Purchaser's Reconciled EI as required by Section 2.02 hereof, Floating Rate Bonds of each Series in an aggregate principal amount equal to the Bond Exchange Amount of such Purchaser for such Series for the Exchange Date;

  (iv) issue in the name of and deliver to the Escrow Agent, for the benefit of the Purchasers pursuant to this Agreement, a U.S. Temporary Escrow Global Registered Floating Rate Bond in an aggregate principal amount equal to the Escrowed Bond Amount; and

certificates delivered pursuant hereto, the statements set forth therein shall be true and correct:

    (i) copies certified by the Minister of Economy and Public Works and Services of Argentina of all Argentine Authorizations (with English translations) necessary for Argentina to execute, deliver and perform this Agreement, any other Bond Agreement and the Amendments or for the validity or enforceability hereof or of any thereof and a certificate of the Minister of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit A-1 to the Closing Book, to the effect that none of such Argentine Authorizations has been amended and each is in full force and effect;

    (ii) a certificate of the Secretary General of the Ministry of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit A-2 to the Closing Book, as to the authority, incumbency and specimen signatures of the persons who have executed or will execute this Agreement and the other Bond Agreements and the other instruments and documents to be executed and delivered hereunder or thereunder by Argentina;

    (iii) a certificate of the Minister of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit A-3 to the Closing Book, to the effect that:

        (A) no default in the payment of principal or interest of which Argentina has been notified in writing on or prior to September 6, 1992 shall be continuing with respect to any medium-term and long-term External Indebtedness of Argentina or any Designated Argentine Governmental Agency as to which a commercial bank is the original creditor other than indebtedness under the Debt Agreements;

        (B) Argentina has made the Cash Payment and the Interest Reduction Cash Payment;

        (C) Argentina has obtained all waivers under the agreements governing the debt of, or guaranteed by, Argentina to the extent necessary to permit the implementation hereof;

31

(D) each of the representations and warranties made by Argentina in Section 4.01 hereof and in the other Bond Agreements is true and correct on and as of the Exchange Date with the same force and effect as if made on and as of the Exchange Date;

(E) Eligible Debt has continued to be eligible for Argentina's privatization program until the Exchange Date; and

(F) Argentina has (i) made an interest payment of at least U.S. $70,000,000 per month in respect of commercial bank indebtedness in each month since the date of the 1992 Financing Plan through and including the earlier of the month in which the Exchange Date occurs and March 1993, except to the extent any such monthly payment has been added to the Cash Payment as contemplated in Section 2.05(i) hereof and (ii) in the event that the Exchange Date shall not have occurred on or prior to April 7, 1993, deposited on or before the Exchange Date, to secure the payment of interest on the Principal Bonds due and payable on the first interest payment date therefor, U.S. $70,000,000 in respect of each of the months from April 1993 to and including the month in which the Exchange Date occurs.

(iv) copies (with English translations) certified by the President of BCRA, in substantially the form of Exhibit A-4 to the Closing Book, of all resolutions or other actions of the Board of Directors of BCRA and all Argentine Authorizations, in each case, necessary for BCRA to execute, deliver and perform the BCRA Undertaking and the Obligor Consent and for the validity or enforceability thereof and designating the President of BCRA as the officer authorized to execute and deliver such documents and instruments;

(v) a certificate of the Secretary of the Board of Directors of BCRA, in substantially the form of Exhibit A-5 to the Closing Book, certifying as to the authority, incumbency and specimen signature of the President of BCRA;

(vi) a certificate of the Minister of Economy and Public Works and Services of Argentina and of

Citibank, N.A., as Closing Agent, substantially in the form of Exhibit A-6 to the Closing Book as to:

    (A) the satisfaction (or waiver) of the conditions to the Exchange Date under (and as defined in) the Principal Bond Exchange Agreement; and

    (B) the substantial completion of the reconciliation to identify the Recognized Holders of the Eligible Debt;

(vii) an opinion of the <u>Procurador del Tesoro de la Nación</u> (Attorney of the National Treasury of Argentina), substantially in the form of Exhibit A-7 to the Closing Book;

(viii) an opinion of the General Counsel of BCRA, in substantially the form of Exhibit A-8 to the Closing Book;

(ix) an opinion of Cleary, Gottlieb, Steen & Hamilton, special New York counsel to Argentina and BCRA, substantially in the form of Exhibit A-9A to the Closing Book;

(x) a certificate of the Minister of Economy and Public Works and Services of Argentina as to Eligible Debt and Eligible Interest of Argentine Banks, substantially in the form of Exhibit A-10 to the Closing Book;

(xi) a letter from the IMF, confirming that the Extended Fund Facility Arrangement remains in effect and that, with the exception of the set aside amounts for debt reduction operations, Argentina has made each purchase under the Extended Fund Facility Arrangement as to which the originally scheduled test date occurred at least 90 days prior to the Exchange Date, substantially in the form of Exhibit A-11 to the Closing Book;

(xii) an opinion of Shearman & Sterling, special New York counsel to the Working Committee for Argentina and the Closing Agent, substantially in the form of Exhibit A-14A to the Closing Book;

(xiii) an opinion of Gallo & Bruchou, special Argentine counsel to the Working Committee for

33

Argentina and the Closing Agent, substantially in the form of Exhibit A-15 to the Closing Book;

(xiv) an opinion of Slaughter & May, special English counsel to the Closing Agent, substantially in the form of Exhibit A-16 to the Closing Book;

(xv) a letter from the New York Process Agent for Argentina, substantially in the form of Exhibit A-17A to the Closing Book;

(xvi) a letter from the Alternate New York Process Agent for Argentina, substantially in the form of Exhibit A-17B to the Closing Book;

(xvii) a letter from the New York Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-17C to the Closing Book;

(xviii) a letter from the Alternate New York Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-17D to the Closing Book;

(xix) a letter from the London Process Agent for Argentina, substantially in the form of Exhibit A-18A to the Closing Book;

(xx) a letter from the Alternate London Process Agent for Argentina, substantially in the form of Exhibit A-18B to the Closing Book;

(xxi) a letter from the London Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-18C to the Closing Book; and

(xxii) a letter from the Alternate London Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-18D to the Closing Book.

(c) The Closing Agent shall have received ten counterparts of each of the following (each of which shall be dated as of the Exchange Date), four of which shall be retained by the Closing Agent on behalf of the Purchasers and one of which shall be delivered to special New York counsel to the Closing Agent:

34

(i) the Fiscal Agency Agreement, executed by each party thereto;

(ii) the BCRA Undertaking, executed by BCRA;

(iii) the Obligor Consent, executed by each party thereto;

(iv) the Amendments, executed by Argentina, the Obligors parties thereto and:

(A) in the case of the amendments to each of the 1987 TCA, the 1985 TCA, the 1983 TCA and the Co-Financing Agreement, by the Majority Banks (as defined in the applicable Debt Agreement) and the agent under such Debt Agreement;

(B) in the case of the amendments to the 1987 GRA, by the Majority Syndicate Banks (as defined in the 1987 GRA) and syndicate agent for each Borrower (as defined in the 1987 GRA) thereunder;

(C) in the case of amendments to the AUSA GRA, the Salto Grande GRA and the Alianza Naviera GRA, by the Majority Banks (as defined in the applicable Debt Agreement) and the Agent under such Debt Agreement; and

(D) in the case of amendments to Public Sector Onlending Agreements, by the requisite banks and the agent, if any, in accordance with the provisions of the applicable agreement;

(v) an order from Argentina to the Authenticating Agent, in substantially the form of Exhibit A-20 to the Closing Book, directing the Authenticating Agent to authenticate the Temporary Global Bearer Floating Rate Bonds, the Non-U.S. Permanent Global Registered Floating Rate Bonds, the U.S. Temporary Global Registered Floating Rate Bonds and the U.S. Temporary Escrow Global Registered Floating Rate Bond;

(vi) a certificate of the Registrar, substantially in the form of Exhibit A-21 to the Closing Book, as to delivery in accordance with the Fiscal Agency Agreement of the U.S. Temporary Global Registered Floating Rate Bond referred to in Section 3.02 hereof;

    (vii) a certificate of the Common Depositary, substantially in the form of Exhibit A-22 to the Closing Book, as to delivery in accordance with the Fiscal Agency Agreement of the Non-U.S. Permanent Global Registered Floating Rate Bonds and the Temporary Global Bearer Floating Rate Bonds referred to in Section 3.03 hereof;

    (viii) a certificate of the Offshore Custodian, substantially in the form of Exhibit A-23 to the Closing Book, as to the execution and delivery of Receipts (as defined in the Custodian Agreement) to the Purchasers that are parties to the Custodian Agreement in accordance with the terms hereof;

    (ix) a certificate of the Authenticating Agent, substantially in the form of Exhibit A-24 to the Closing Book, as to the delivery in accordance with the Fiscal Agency Agreement of the Permanent Global Bearer Bonds;

    (x) a letter to the Closing Agent from the Luxembourg Stock Exchange, substantially in the form of Exhibit A-25 to the Closing Book stating that application has been made by Argentina for the listing of the Series L Floating Rate Bonds on the Luxembourg Stock Exchange; and

    (xi) the Escrow Agreement, executed by the Escrow Agent and the Closing Agent (and consented to by Argentina) and a certificate from the Escrow Agent as to receipt of the U.S. Temporary Escrow Global Registered Floating Rate Bond referred to in Section 3.02 hereof.

    (d) Since June 23, 1992 and on or prior to the thirty-fifth day prior to the Exchange Date, there shall have been no adverse change in the financial or economic condition of Argentina which is material in the context of the Exchange.

    (e) The Closing Agent shall have received evidence satisfactory to the Closing Agent that Argentina has paid (A) all fees and expenses required to be paid to the Closing Agent and to the Agents (as defined in the Fiscal Agency Agreement) on or prior to the Exchange Date in accordance with Section 6.05 hereof, the letter referred to in Section 5.01(b) hereof and Section 11 of the Fiscal Agency Agreement (including in each case, without limitation, fees and expenses of counsel as provided

therein), (B) all costs and expenses of members of the Working Committee for Argentina required to be paid or reimbursed by Argentina on or prior to the Exchange Date in accordance with Section 6.05 hereof, (C) all costs and expenses of the Debt Agreement Agents and the Promissory Note Agent required to be paid or reimbursed by Argentina on or prior to the Exchange Date in accordance with Section 6.05 hereof (including, without limitation, fees and expenses of counsel as provided therein) and (D) all fees and expenses of Shearman & Sterling, special New York counsel to the Working Committee for Argentina and the Closing Agent, and Gallo & Bruchou, special Argentine counsel to the Working Committee for Argentina and the Closing Agent required to be paid or reimbursed by Argentina on or prior to the Exchange Date in accordance with Section 6.05 hereof, and deposited all amounts required to be deposited with the Closing Agent on or prior to the Exchange Date in accordance with each of the letter agreements dated the date hereof between Argentina and the Closing Agent relating to fees and expenses of counsel to the Working Committee for Argentina and the Closing Agent; *provided* that, except with respect to amounts required to be deposited, a statement, invoice or other claim in respect of any amount referred to above has been submitted to Argentina on or prior to the date 30 calendar days prior to the Exchange Date. The payment of such fees, costs, expenses or other amounts referred to above in this subsection (e) in satisfaction of such condition precedent shall be without prejudice to the right of Argentina to contest in good faith any such payment.

Documentation that varies from the requirements of subsection (a), (b) or (c) above may be accepted and the condition set forth in subsection (d) above may be waived, in each case, with the consent of Purchasers having at least 66 2/3% of the aggregate of the Reconciled EI and Unreconciled EI of all Purchasers for the Exchange Date; *provided* that, except as set forth below, documentation relating specifically to any Series of Floating Rate Bonds that varies from the above requirements may be accepted with the consent of Purchasers having at least 66 2/3% of the aggregate of all Reconciled EI and Unreconciled EI of all Purchasers for the Exchange Date that is to be exchanged for such Series of Floating Rate Bonds, if any, on the Exchange Date or with respect to which Floating Rate Bonds of such Series are to be escrowed on the Exchange Date. The condition referred to in Section 2.03(d) hereof shall be deemed to have been satisfied if, on or prior to the thirtieth day prior to the Exchange Date, the Closing Agent