8

"**Indemnified Party**" has the meaning specified in Section 11(b) hereof.

"**Interest Amount**" has the meaning specified in Paragraph 3 of the Terms and Conditions of the Bonds.

"**Interest Determination Date**" has the meaning specified in Paragraph 3 of the Terms and Conditions of the Bonds.

"**Interest Payment Date**" has the meaning specified in Paragraph 2(c) of the Terms and Conditions of the Bonds.

"**Interest Period**" has the meaning specified in Paragraph 3 of the Terms and Conditions of the Bonds.

"**Lien**" means any lien, pledge, mortgage, security interest, deed of interest, charge or other encumbrance or preferential arrangement having the practical effect of constituting a security interest.

"**London Process Agent**" has the meaning specified in Section 17(c) hereof.

"**Maturity Date**" has the meaning, with respect to each Series of Bonds, specified in the Terms and Conditions of the Bonds of such Series.

"**New York Process Agent**" has the meaning specified in Section 17(c) hereof.

"**1985 TCA**" means the Term Credit Agreement dated as of August 1, 1985, among BCRA, the Republic of Argentina, as guarantor, Citibank, N.A., as agent, and the banks party hereto, as amended and restated as of August 1, 1987 and as further amended as of March 1, 1988.

"**1987 BNA Refinancing Agreement**" means the Refinancing Agreement dated as of August 1, 1987 among Banco de la Nación Argentina ("BNA"), Manufacturers Hanover Trust Company, as agent, and the banks party thereto.

"**1987 GRA**" means the Guaranteed Refinancing Agreement dated as of August 1, 1987 among the borrowers listed therein, BCRA, the Republic of Argentina, as guarantor, the syndicate agents named therein and the banks party thereto.

"**1987 Provincia Refinancing Agreement**" means the Refinancing Agreement, dated as of August 1, 1987, among

Banco de la Provincia de Buenos Aires, The Bank of New York, as agent, and the banks party thereto.

"**1987 TCA**" means the Term Credit Agreement dated as of August 1, 1987, among BCRA, the Republic of Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended.

"**1983 TCA**" means the Term Credit Agreement dated as of August 16, 1983, among BCRA, the Republic of Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended and restated as of August 1, 1987 and as further amended as of March 1, 1988.

"**Non-U.S. Global Exchange Date**" means the 40th calendar day following the Exchange Date.

"**Non-U.S. Permanent Global Registered Bonds**" means the Non-U.S. Permanent Global Registered Floating Rate Bonds issued by Argentina, substantially in the form of Exhibit 2C to the Floating Rate Bond Exchange Agreement.

"**Non-U.S. Person**" means any Person other than a U.S. Person, as notified to the Fiscal Agent.

"**Non-U.S. Purchaser**" means any Purchaser other than a U.S. Purchaser.

"**Obligor**" means each Argentine borrower party to a Debt Agreement other than Argentina.

"**Obligor Consent**" means the Obligor Consent in the form of Exhibit 5 to the Floating Rate Bond Exchange Agreement.

"**Official Source**" means any of the IMF, the IBRD, the IABD and the Export-Import Bank of Japan.

"**Other Applicable Taxes**" has the meaning specified in Paragraph 5(b) of the Bonds.

"**Paying Agent**" has the meaning specified in Section 2(c) hereof.

"**Payment Account**" has the meaning specified in Section 6(b) hereof.

"**Permanent Global Bearer Bond**" has the meaning specified in Section 3(a)(iii) hereto.

10

"Person" means an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other juridical entity, or a sovereign state or any agency or political subdivision thereof.

"Pesos" means lawful currency of Argentina.

"Principal Bond Agreements" means the Principal Bond Exchange Agreement, the USD Fiscal Agency Agreement, the DMK Fiscal Agency Agreement, each Collateral Pledge Agreement for the Principal Bonds, the Obligor Consent, and any agreement or instrument or document delivered thereunder which may be necessary for the exchange of Reconciled ED for Principal Bonds.

"Principal Bond Exchange Agreement" means the Collateralized Discount Bond and Par Bond Exchange Agreement dated December __, 1992 among Argentina, the Closing Agent, the Debt Agreement Agents and the Purchasers parties thereto, as amended and in effect from time to time.

"Principal Bonds" means the USD Discount Bonds, the USD Par Bonds, the Republic of Argentina Collateralized DMK Discount Series Bonds Due 2023 and the Republic of Argentina Collateralized DMK Par Series Bonds due 2023.

"Principal Payment Date" has the meaning, with respect to each Series of Bonds, specified on the face of the Bonds of such Series.

"Process Agents" has the meaning specified in Section 17(c) hereof.

"Promissory Notes" means (i) the instruments issued by Argentina and BCRA pursuant to BCRA Communications A-251, A-695, A-696, A-697, A-790, A-893, A-894, A-895, A-946 and A-956, as amended or supplemented, (ii) the instruments issued pursuant to BCRA Communications A-1084, A-1122, A-1274, A-1745, and A-1963 and (iii) all bonds, promissory notes or other contractual obligations maturing prior to the Exchange Date (whether in accordance with their original schedules or otherwise), in each case, which are eligible to be exchanged for the instruments issuable pursuant to BCRA Communications A-1084 and A-1122.

"Public Sector Onlending Agreements" means any agreement documenting an Additional Loan (as defined in the 1983 TCA and the 1985 TCA) or an Investment Fund Loan (as defined in the 1987 TCA) to any Argentine public sector borrower.

"**Publicly Issued External Indebtedness**" means External Indebtedness which (i) is publicly issued or privately placed on the capital markets, (ii) is in the form of, or represented by, bonds, notes or other securities or any guaranty thereof and (iii) is, or may be, quoted, listed or ordinarily purchased and sold on any stock exchange, automated trading system or over-the-counter, or other securities market.

"**Purchaser**" has the meaning specified in the introductory paragraph of the Floating Rate Bond Exchange Agreement.

"**Rate of Interest**" has the meaning specified in Paragraph 3 of the Terms and Conditions of the Bonds.

"**Reconciled ED**" of a Purchaser has the meaning specified in the Principal Bond Exchange Agreement.

"**Reconciled ECI**" has the meaning specified in the Floating Rate Bond Exchange Agreement.

"**Reconciled EI**" has the meaning specified in the Floating Rate Bond Exchange Agreement.

"**Reconciliation Cut-Off Date**" for an Exchange Date on an Escrow Release Date, as the case may be, means the 20th calendar day preceding the anticipated date for such Exchange Date or such Escrow Release Date, as the case may be, as notified by the Closing Agent pursuant to Section 2.05 of the Floating Rate Bond Exchange Agreement.

"**Reference Banks**" has the meaning specified in Paragraph 3 of the Floating Rate Bonds.

"**Registered Bonds**" has the meaning specified in Section 1(b) hereof.

"**Registrar**" has the meaning specified in Section 2(d) hereof.

"**Regulation S**" has the meaning specified in Section (1) of Schedule D hereto.

"**Rule 144A**" means Rule 144A of the United States Securities and Exchange Commission under the Securities Act.

"**Rule 904**" means Rule 904 of Regulation S of the United States Securities and Exchange Commission under the Securities Act.

12

"Salto Grande GRA" means the Guaranteed Refinancing Agreement dated as of December 1, 1987 among Comision Tecnica Mixta de Salto Grande, as borrower, Argentina, BCRA, the banks parties thereto and The Bank of New York, as syndicate agent for such banks.

"Schedule" means, with respect to any Global Bond, the schedule appended thereto.

"Securities Act" means the Securities Act of 1933 of the United States, as amended and in effect from time to time.

"Securities Act Legend" means the following legend printed in all capital letters:

THIS BOND HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY IN THE UNITED STATES OF AMERICA, ITS TERRITORIES OR POSSESSIONS, OR TO OR FOR THE ACCOUNT OF ANY U.S. PERSON (AS DEFINED IN REGULATION S OF THE UNITED STATES SECURITIES ACT OF 1933), EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR IN A TRANSACTION NOT REQUIRING REGISTRATION UNDER SUCH ACT. THIS BOND IS TRANSFERABLE ONLY AS PROVIDED HEREIN AND IN THE FISCAL AGENCY AGREEMENT REFERRED TO BELOW.

"Series" means each of the Series of Floating Rate Bonds.

"Series L Bonds" has the meaning specified in Section 1(a) hereof.

"Series U Bonds" has the meaning specified in Section 1(a) hereof.

"Temporary Global Bearer Bonds" has the meaning specified in Section 3(a) hereof.

"Terms and Conditions" means the provisions set forth under the "Terms and Conditions of Bonds" endorsed on the reverse side of the Bonds.

"Transfer Agent" has the meaning specified in Section 2(e) hereof.

"United States" and "U.S." each mean the United States of America, its territories and possessions, any State of the United States and the District of Columbia.

"U.S. Dollars" or "U.S. $" or "USD" means lawful currency of the United States.

"USD Fiscal Agency Agreement" means the USD Discount Bond and Par Bond Fiscal Agency Agreement between Argentina and the Fiscal Agent thereunder, substantially in the form of Exhibit 4A to the Discount Bond and Par Bond Exchange Agreement, as amended and in effect from time to time.

"U.S. Person" means (i) any natural person resident in the United States; (ii) any partnership or corporation organized or incorporated under the laws of the United States; (iii) any estate of which any executor or administrator is a U.S. Person; (iv) any trust of which any trustee is a U.S. Person; (v) any agency or branch of a foreign entity located in the United States; (vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (viii) any partnership or corporation if (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. Person principally for the purpose of investing in securities not registered under the Securities Act unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts; provided, however, that the following shall not be deemed to be U.S. Persons:

(1) any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a Non-U.S. Person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States;

(2) any estate of which any professional fiduciary acting as an executor or administrator is a U.S. Person if (i) another executor or administrator who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate and (ii) the estate is governed by foreign law;

(3) any trust of which any professional fiduciary acting as a trustee is a U.S. Person if (i) another trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets

and (ii) no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person;

(4) any branch or agency of a U.S. bank or insurance company located outside the United States if such agency or branch (i) operates for valid business reasons, (ii) is engaged in the banking or insurance business and (iii) is subject to substantive local banking or insurance regulation; and

(5) multinational entities such as the United Nations, the International Monetary Fund, the International Bank for Reconstruction and Development, the various development banks and their agencies, affiliates and pension plans.

"U.S. Purchaser" means any Purchaser that is (i) a United States Person" (as defined in Section 7701(a)(30) of the Code) or (ii) a U.S. Person; provided, however, that a U.S. Purchaser shall not include a foreign branch of a United States "financial institution" (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v)) that agrees to comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Code.

"U.S. Temporary Global Bonds" means the U.S. Temporary Global Registered Bonds and the U.S. Temporary Escrow Global Registered Bonds.

"U.S. Temporary Global Registered Bond" means the U.S. Temporary Global Registered Floating Rate Bond issued by Argentina substantially in the form of Exhibit 2C of the Floating Rate Bond Exchange Agreement.

"U.S. Temporary Escrow Global Registered Bond" means the U.S. Temporary Escrow Global Registered Floating Rate Bond issued by Argentina substantially in the form of Exhibit ) of the Floating Rate Bond Exchange Agreement.

"USD Discount Bonds" means the Collateralized USD Discount Series L Bonds Due 2023 and the Collateralized USD Discount Series U Bonds Due 2023.

"USD Equivalent" means (i) of any amount of Eligible Interest denominated in an Original Currency other than U.S. Dollars, a U.S. Dollar amount calculated on the basis of the Translation Rate applicable to such Original Currency and (ii) of any amount of Eligible Interest denominated in U.S. Dollars, a U.S. Dollar amount equal to such amount.

15

"USD Par Bonds" means the Collateralized USD Par Series L Bonds Due 2023 and the Collateralized USD Par Series U Bonds Due 2023.

"Voting Certificate" has the meaning specified in Section 13(f) hereof.

EXHIBIT 4
to Floating Rate Bond
Exchange Agreement

UNDERTAKING dated as of _____, 1993 made by BANCO CENTRAL DE LA REPUBLICA ARGENTINA ("BCRA") in favor of CITIBANK, N.A., as Fiscal Agent (the "Fiscal Agent") under the Fiscal Agency Agreements referred to below and as Closing Agent (the "Closing Agent") under the Bond Exchange Agreements referred to below, the other Agents (the "Agents") under the Fiscal Agency Agreements referred to below, the Purchasers (the "Purchasers") party to such Bond Exchange Agreements and the holders (the "Bondholders") of Bonds (as defined below).

PRELIMINARY STATEMENTS.

1. The Republic of Argentina ("Argentina"), the institutions named therein as Purchasers (the "Discount Bond and Par Bond Purchasers"), the Closing Agent and the financial institutions named therein as "Debt Agreement Agents" are parties to the Collateralized Discount Bond and Par Bond Exchange Agreement dated as of _____, 199_ (as amended and in effect from time to time, the "Discount Bond and Par Bond Exchange Agreement") which provides for the issuance of Discount Bonds and Par Bonds (collectively, the "Principal Bonds").

2. The Principal Bonds will be entitled to the benefits of (i) the USD Discount Bond and Par Bond Fiscal Agency Agreement dated as of _____, 199_ (as amended and in effect from time to time, the "USD Discount Bond and Par Bond Fiscal Agency Agreement") among Argentina, Citibank (Luxembourg) S.A., as Authenticating Agent, Transfer Agent and Paying Agent and Citibank, N.A., as Authenticating Agent, Registrar, Transfer Agent, Paying Agent and Fiscal Agent (Citibank, N.A. and its successors in such latter capacity being hereinafter called the "USD Discount Bond and Par Bond Fiscal Agent") and (ii) the DMK Discount Bond and Par Bond Fiscal Agency Agreement dated as of _____, 199_ (as amended and in effect from time to time, the "DMK Discount Bond and Par Bond Fiscal Agency Agreement" and, together with the USD Discount Bond and Par Bond Fiscal Agency Agreement, the "Discount Bond and Par Bond Fiscal Agency Agreements") among Argentina, _____, as Principal Paying Agent and Citibank, N.A., as Calculation Agent and Fiscal Agent (Citibank, N.A. and its successors in such latter capacity being hereinafter called the "DMK Discount Bond and Par Bond Fiscal Agent" and, together with the USD Principal Bond Fiscal Agent, the "Discount Bond and Par Bond Fiscal Agent").

2

3. Argentina, the institutions named therein as Purchasers (the "**Floating Rate Bond Purchasers**" and, together with the "**Discount Bond and Par Bond Purchasers**", the "**Purchasers**"), the Closing Agent and the Debt Agreement Agents are parties to the Floating Rate Bond Exchange Agreement dated as of _____, 199_ (as amended and in effect from time to time, the "**Floating Rate Bond Exchange Agreement**" and, together with the Discount Bond and Par Bond Exchange Agreement, the "**Bond Exchange Agreements**") which provides, among other things, for the issuance of Floating Rate Bonds.

4. The Floating Rate Bonds will be entitled to the benefits of the Floating Rate Bond Fiscal Agency Agreement dated as of _____, 199_ (as amended and in effect from time to time, the "**Floating Rate Bond Fiscal Agency Agreement**" and, together with the Discount Bond and Par Bond Fiscal Agency Agreements, the "**Fiscal Agency Agreements**") among Argentina, Citibank (Luxembourg) S.A., as Authenticating Agent and Paying Agent and Citibank, N.A., as Authenticating Agent, Paying Agent and Fiscal Agent (Citibank, N.A. and its successors in such latter capacity being hereinafter called the "**Floating Rate Bond Fiscal Agent**" and, together with the "**Discount Bond and Par Bond Fiscal Agent**", the "**Fiscal Agent**").

5. As used in this Undertaking, except as otherwise expressly provided or unless the context otherwise requires, capitalized terms shall have the meaning set forth in the Fiscal Agency Agreements or in the Bond Exchange Agreements. As used herein, "**Bonds**" means the Principal Bonds and the Floating Rate Bonds and "**Bond Agreements**" means the Principal Bond Agreements and the Floating Rate Bond Agreements.

6. It is a condition precedent to the Exchange of Eligible Debt and Eligible Interest for Bonds under the Bond Exchange Agreements that BCRA shall have executed and delivered this Undertaking.

7. BCRA is willing to provide U.S. Dollars and Deutsche Mark (each as "**Principal Bond Currency**") in connection with the obligations under the Bond Agreements on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the above and to induce the Closing Agent, the Fiscal Agent, the other Agents and each Purchaser to consummate the transactions contemplated in the Bond Exchange Agreements, BCRA hereby agrees as follows:

3

SECTION 1. <u>Undertaking</u>. (a) <u>Undertaking to Provide Principal Bond Currencies</u>. In connection with any payments to be made by Argentina pursuant to the Bond Agreements, BCRA irrevocably agrees to provide Principal Bond Currencies, on behalf of Argentina, to the Closing Agent, Fiscal Agent or any other Agent at the times, in the manner, and at the places specified in the relevant Bond Agreement; <u>provided, however</u>, that BCRA shall be obligated to provide such amounts of Principal Bond Currencies only to the extent that: (i) Principal Bond Currencies are not freely available in the market; (ii) such Principal Bond Currencies are available to BCRA; and (iii) BCRA has received from Argentina the equivalent in Pesos of the Principal Bond Currencies to be so provided.

(b) <u>Principal Bond Currency Holdings</u>. BCRA will use its best efforts, consistent with its discretion to exercise prudent financial judgment in the management of the international reserves, to maintain sufficient amounts in any Principal Bond Currency to enable it to comply with its obligations set forth in Section 1(a) above.

(c) <u>No Guarantee, Etc</u>. The execution and delivery of this Undertaking by BCRA shall not be considered as constituting a guarantee by BCRA of any obligations of Argentina under the Bond Agreements. Upon the occurrence of the events contained in the proviso in Section 1(a) hereof, the obligations undertaken by BCRA hereunder shall thereupon constitute its own direct obligation to the Closing Agent, the Fiscal Agent and each other Agent, Purchaser and Bondholder.

(d) <u>Amendment, Etc., to Bond Agreements</u>. BCRA acknowledges that it has received copies of the 1992 Financing Plan and each Bond Agreement and that any provision of any Bond Agreements may be amended, modified, supplemented or waived in accordance with the terms thereof without the consent of BCRA and without affecting the obligations of BCRA hereunder.

(e) <u>Authorizations and Instructions</u>. Without limiting the obligations of the BCRA set forth in Section 1(a) hereof, BCRA acknowledges that Argentina may from time to time deposit with BCRA certain amounts in Pesos and deliver to BCRA certain authorizations directing it to make payments of principal of, or interest on, the Bonds or other amounts required to be paid by Argentina to the Closing Agent, the Fiscal Agent or any other Agent, and BCRA agrees

4

to comply with any such instructions, to the extent permitted by the Carta Organica of the BCRA (Law No. 24,144) (the "Carta Organica"), subject to the proviso contained in Section 1(a) hereof. In particular, BCRA acknowledges receipt of (i) copies of the Bond Agreements and (ii) a written authorization from Argentina irrevocably instructing BCRA to provide amounts in Principal Bond Currencies to the Closing Agent, the Fiscal Agent and the other Agents at the times, in the manner and at the places specified in such Bond Agreements, and BCRA hereby agrees that it shall, to the extent permitted by the Carta Organica, comply with such irrevocable instructions, subject to the proviso set forth in Section 1(a) hereof.

SECTION 2. Representations and Warranties of BCRA. BCRA represents and warrants as follows:

(a) Due Organization, Etc. It is a self-administered entity (entidad autárquica), duly organized, validly existing and in good standing under the laws of Argentina, is the central bank and monetary authority of Argentina and, as such, holds and administers the gold, foreign exchange and all other international monetary assets of Argentina.

(b) Authorization, No Contravention, Etc. The execution, delivery and performance by BCRA of this Undertaking is within BCRA's powers, has been duly authorized by all necessary legislative, executive, administrative and other governmental and corporate action, and does not (i) contravene the Carta Orgánica of BCRA, (ii) violate any constitutional provision, treaty, statute, law, regulation, decree, court order or similar authority binding upon BCRA or (iii) contravene any contractual restriction binding upon BCRA or any of its properties.

(c) No Further Approvals Required. No authorization or approval (including budget approval) or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by BCRA of this Undertaking other than those which have been obtained and are in full force and effect.

(d) Legal Effect. This Undertaking is the legal, valid and binding obligation of BCRA enforceable against BCRA in accordance with its terms.

5

(e) <u>No Immunities, Etc</u>. BCRA is subject to civil and commercial law with respect to its obligations hereunder, and the execution, delivery and performance by BCRA of this Undertaking constitute private and commercial acts (<u>jure gestionis</u> acts) rather than public or governmental acts (<u>jure imperii</u> acts). Under the laws of Argentina, neither BCRA nor any of its property has any immunity (sovereign or otherwise) from set-off, from jurisdiction of any court in Argentina or any legal process in any court in Argentina (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise), except for (x) property of the public domain located in the territory of Argentina included within the provisions of Articles 2337 and 2340 of the Civil Code of Argentina, (y) property owned by BCRA and located in Argentine territory which is dedicated to the purpose of an essential public service and (z) the assets which constitute freely available reserves of Argentina, pursuant to Article 6 of the Convertibility Law which are held and administered by BCRA, the amount, composition and investment of which will be reflected on the balance sheet and accounting statement of BCRA consistently prepared pursuant to Article 5 of the Convertibility Law. Except in connection with actions brought to enforce judgments obtained outside Argentina, pursuant to Law 3,952 and Law 23,982 (particularly its Article 22), judgments rendered by a court in Argentina against BCRA, in general, can only be enforced against BCRA to the extent such judgments are not complied with by Argentina within a certain period of time. Any judgment against BCRA of a court outside Argentina, which satisfies the requirements of Articles 517 through 519 of Law 17,454, as amended by Law 22,434 (National Code of Civil and Commercial Procedures) is capable of being enforced in the courts of Argentina in accordance with the laws of Argentina.

SECTION 3. <u>Covenant of BCRA</u>: So long as Argentina has any obligations under any Bond Agreement, BCRA shall obtain and maintain in full force and effect all authorizations, and duly take all necessary and appropriate governmental and administrative action in Argentina, necessary for BCRA to perform its obligations hereunder.

SECTION 4. <u>Jurisdiction; Waiver of Immunities</u>.
(a) BCRA hereby irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting

6

in New York City, the High Court of Justice in London, any Federal court sitting in the City of Buenos Aires, the District Court (<u>Landgericht</u>) of Frankfurt am Main and any appellate court from any thereof, in any suit, action or proceeding arising out of or relating to this Undertaking, the Bonds and the other Bond Agreements (except that BCRA shall submit to the jurisdiction of the District Court (<u>Landgericht</u>) of Frankfurt am Main only with respect to suits, actions or proceedings arising out of or relating to the Principal Bonds denominated in Deutsche Mark and the Principal Bond Agreements relating thereto), and BCRA hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court, in the High Court of Justice in London, any Federal court sitting in the City of Buenos Aires or the District Court (<u>Landgericht</u>) of Frankfurt am Main. BCRA irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any such suit, action or proceeding and any objection to any such suit, action or proceeding whether on the grounds of venue, residence or domicile. A final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by law.

(b) BCRA hereby irrevocably appoints (i) the New York office of Banco de la Nación Argentina (the "<u>New York Process Agent</u>"), with an office on the date hereof at 299 Park Avenue, 2nd floor, New York, New York 10171, United States and, alternatively, hereby irrevocably appoints CT Corporation System, with an office on the date hereof at 1633 Broadway, 23rd floor, New York, New York 10019, United States (the "<u>Alternate New York Process Agent</u>"), in each case, as its agent to receive, on behalf of BCRA and its property, service of copies of the summons and complaint and any other process which may be served in any such action or proceeding brought in such New York State or Federal court sitting in New York City, (ii) the London office of Banco de la Nación Argentina (the "<u>London Process Agent</u>"), with an office on the date hereof at Longbow House, 14-20 Chiswell Street, London EC14 4SD, England, United Kingdom and, alternatively, hereby irrevocably appoints The Law Debenture Trust Corporation p.l.c., with an office on the date hereof at Prince's House, 95 Gresham St., London EC2V 7LY, England, United Kingdom (the "<u>Alternate London Process Agent</u>" and, together with the New York Alternate Process Agent, the "<u>Alternate Process Agents</u>"), in each case, as its agent to receive on behalf of itself and its respective property service of copies of the